UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAGAT RAM                                            No. C 09-2732 (JCS)

          Plaintiff(s),                     **ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

     v.                                          **[Docket No. 58]**

INFINITY SELECT INSURANCE,

          Defendant(s).
_____/

## I.   INTRODUCTION

      Plaintiff Jagat Ram ("Plaintiff") brought this suit after Infinity Select Insurance ("Defendant") denied his vehicle theft claim.  On April 5, 2011, Defendant filed the present Motion for Summary Judgment; or, in the Alternative, Partial Summary Judgment ("the Motion"), which came on for hearing on July 22, 2011.  Having considered the papers and arguments of counsel, and for the reasons stated below, the Motion is GRANTED.

## II.   BACKGROUND

### A.   Facts

      In 2005, Plaintiff purchased a Lamborghini "kit car"[1] on a Pontiac Fiero chassis in Vancouver, Canada, from a kit car maker named "Reggie."  Ram Decl. at ¶ 3; Ram Examination Under Oath (EUO) at 42:22-43:3; Affidavit of Vehicle Theft ("Affidavit") at 00596.  Plaintiff states

---

[1] "Kits" allow a purchaser to install a new body on an existing vehicle chassis so that the vehicle appears to be of the make and model of the kit.  *See Gen. Motors Corp. v. Urban Gorilla, LLC,* 500 F.3d 1222, 1225 (10th Cir. 2007).

that he paid $75,000 for the vehicle.[2]  Ram Decl. at ¶ 3; Ram EUO at 42:8-10; Affidavit at 00596.

After the purchase, Plaintiff drove the vehicle to the Bay Area.  Ram Decl. at ¶ 3.

Plaintiff insured his Lamborghini kit car with Infinity, with coverage beginning on March 11, 2008, for an agreed value of $95,000.  Insurance Policy ("Policy") at 00263.  The vehicle he insured had vehicle identification number (VIN) 1G2PF37R3FP200202.  *Id.*  Coverage was to last until March 11, 2009.  *Id.*  The policy contained the following provision regarding fraud: "We do not provide coverage for any 'insured' who has made fraudulent statements or engaged in fraudulent conduct in connection with any accident or loss for which coverage is sought under this policy." Joint Statement of Undisputed Facts (JSUF) No. 1 (Policy at 00275).  The policy also contained a cooperation clause, providing that "a person seeking coverage must: 1. Cooperate with us in the investigation, settlement or defense of any claim or suit."  JSUF No. 38 (Policy at 00274).  Should the person seeking coverage fail to cooperate, the policy provided that Infinity would have no duty to provide coverage if that failure to cooperate would be prejudicial to it.  *Id.*  Finally, Plaintiff's policy provided: "No legal action may be brought against [Infinity] until there has been full compliance with all the terms of this policy."  JSUF No. 39 (Policy at 00275).

Plaintiff claims that on June 4, 2008, his kit car was stolen from its parking spot in Hayward, CA.  Affidavit at 00593.  That same day, Plaintiff reported the loss to the Hayward Police Department.  JSUF No. 50.

On June 9, 2008, Plaintiff reported the theft of the kit car to Infinity.  Ram Depo. Vol. II at 383: 3-9.  Although Plaintiff's policy requires that he "promptly" notify Infinity in the event of a loss, Plaintiff testified that he waited five days to report the theft because he hoped the vehicle would be recovered.  JSUF No. 53 (Policy at 00274); Ram Depo. Vol. II at 383:10-12.  Heather Roberts, Infinity's Special Investigations Unit adjuster assigned to Plaintiff's case, stated that in her

---

[2]Plaintiff has not provided any documentation that he did in fact purchase the vehicle for $75,000 despite requests for such documentation by Defendant.  JSUF No. 56; Ram EUO at 110:12-22.

United States District Court

For the Northern District of California

experience, "individuals usually promptly report stolen cars to their insurers at or near the time of the alleged theft." Roberts Decl. at ¶ 4.

Plaintiff provided testimony regarding his vehicle theft claim during Recorded Statements on June 10, 2008, and July 10, 2008. 6/10/08 Recorded Statement at 00162; 7/10/08 Recorded Statement at 00175. "Lori Hazzard" or "Laurie Houser"[3] took Plaintiff's June 2008 Recorded Statement, and Ms. Roberts took Plaintiff's July 2008 Recorded Statement. 12/10/08 Letter at 00038; 6/10/08 Recorded Statement at 00162; Roberts Decl. at ¶ 6; 7/10/08 Recorded Statement at 00175. Plaintiff also submitted an Affidavit of Vehicle Theft ("Affidavit"), marked "received" by Infinity's Special Investigations Unit on July 7, 2008. Affidavit at 00593. On September 10, 2008, Plaintiff testified at an Examination Under Oath (EUO), requested by Infinity. JSUF Nos. 40, 42. Prior to the EUO, Infinity requested by letter that Plaintiff bring with him various documents and records, including any and all documents that evidenced his income from January 1, 2008, through June 30, 2008, as well as documents regarding all insurance claims filed in the past five years, monthly bank statements, a bill of sale for the vehicle at issue, and maintenance records. 8/12/08 Letter at 00385. Plaintiff admits that he intended for Infinity to rely on his statements in his Recorded Statements, Affidavit, and EUO as true in order to receive benefits under his insurance policy, and Infinity did in fact rely on those statements. JSUF Nos. 16, 18, 22, 29, 33, and 36 (Plaintiff's Responses to Defendant's Requests for Admission, Set Two, Nos. 6, 12, 24, and 36).

On December 10, 2008, Infinity denied Plaintiff's vehicle theft claim based on evidence of fraud. JSUF No. 65; 12/10/08 Letter at 00036, 00040. On April 6, 2009, Plaintiff filed suit against Infinity alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair business practices. Plaintiff again provided sworn testimony during the discovery phase of his lawsuit against Infinity.

---

[3]"Lori Hazzard" appears on Bate page 00162 of Plaintiff's June 10, 2008 Recorded Statement transcript, but Infinity's December 12, 2008 letter to Plaintiff states that "Laurie Houser" took Plaintiff's first Recorded Statement.

United States District Court
For the Northern District of California

1    **1.    Plaintiff's Testimony**

2         *a.    Persons Accompanying Plaintiff at the Time of the Theft*

3         Plaintiff testified during his June 2008 Recorded Statement that at the time of the theft, he

4   was meeting a couple of his "buddies" at a bar.  JSUF No. 54.  However, when pressed to name

5   those "buddies," he stated that he had only been meeting his cousin.  *Id.*  Consistent with his

6   eventual Recorded Statement testimony regarding who was with him at the time of the theft,

7   Plaintiff stated in his Affidavit that he had been meeting his cousin at "Buffalo Bill" at the time his

8   vehicle was stolen.  Affidavit at 00597.

9         *b.    Location of the Vehicle at the Time of the Theft*

10        The narrative accompanying the police report states that the vehicle was stolen from a

11  parking lot located at 1082 B Street.  JSUF No. 64; Police Report at 00616.  During his EUO,

12  Plaintiff stated that at the time of the alleged theft, the vehicle was parallel parked on B Street.  Ram

13  EUO at 59:4-17.  After being shown a picture of the alleged location, which demonstrated that there

14  were no parallel parking spots in that area, Plaintiff testified that he had parked the vehicle in a

15  diagonal space.  *Id.* at 92:3-93:9.  Plaintiff states that he was confused as to the meaning of parallel

16  and diagonal parking spaces ("I screwed up on the word," Ram EUO at 93:9).  Defendant maintains

17  that Plaintiff's testimony that the car was parallel parked and his testimony that it was parked in a

18  diagonal space are both inconsistent with the police report, which states that the car was parked in a

19  lot.  Police Report at 00616.

20        *c.    Vehicle Make, Model, Identification Number (VIN), and Registration*

21        The police report, dated June 4, 2008, identifies Plaintiff's stolen vehicle as a 1985 Pontiac

22  Fiero.[4]  JSUF Nos. 51, 52; Police Report at 00615.  On his Affidavit, Plaintiff marked the make and

23  _____

24        [4]Plaintiff points out that the police report shows that something was written and then crossed out
    under "model" before "Fiero" was written down.  Police Report at 00615; Ram Depo. Vol. I at 61:11-25.

25  Plaintiff suggests that the officer was "trying to put 'kit car' on here and he crossed it out, possibly."
    Ram Depo. Vol. I at 61:19-20.  During the second day of his deposition, Plaintiff stated that he

26  "specifically told the police officer it was [sic] Pontiac Fiero replica of a Lamborghini."  Ram Depo.
    Vol. II at 399:13-15.  Plaintiff also stated that the description of the vehicle as a 1985 Pontiac Fiero was

27  sufficient for the police to locate it.  Ram Depo. Vol. I at 64:24-65:6.

28                                                      4

United States District Court

For the Northern District of California

1  model of the vehicle stolen as a 1985 Pontiac Fiero and stated that he paid $75,000 for the vehicle.

2  Affidavit at 00594, 00596.  However, at his EUO, Plaintiff testified that he informed the Department

3  of Motor Vehicles (DMV) that the purchase price for the vehicle  was "a low number . . . probably

4  like a couple thousand dollars."  JSUF No. 60; Ram EUO at 108:17-109:3.  Plaintiff registered the

5  vehicle with the DMV as a 1985 Pontiac Fiero, not a kit car Lamborghini.  Ram EUO at 108:17-

6  109:10.  During this line of questioning, Plaintiff admitted that he provided false information to the

7  DMV as to the purchase price of his vehicle.  *Id.* at 109:12-17.

8          At his deposition, Plaintiff testified that the VIN of the car that he insured with Infinity and

9  reported to the police as stolen was 1G2PF37R3FP200202.  Ram Depo. Vol. I at 32:23-33:6.

10  However, Plaintiff later testified that the kit car he purchased in 2005 had VIN

11  1G2PG1192HP201855.  Ram Depo Vol. II at 306:21-307:17.  Plaintiff argues that this VIN

12  discrepancy is due to the nature of a kit car – that "this happens when the shell of one car is placed

13  on another car."  Opposition at ¶ II.C.[5]  At his deposition, Plaintiff for the first time disclosed that

14  he had purchased a used Pontiac Fiero in California for $800 from Richard Perino in 2007, towed

15  both the Lamborghini kit car insured with Infinity and the Pontiac Fiero to Canada, and paid $10,000

16  to transfer the Lamborghini kit car to the Pontiac Fiero frame.  JSUF Nos. 67, 68; Ram Depo. Vol. I

17  at 46:3-15, 51:10-20; Ram Decl. at ¶ 4.  Plaintiff states that he did not disclose the 2007 purchase or

18  the work done in Canada during the original investigation of his claim because he did not believe it

19  was relevant to Infinity's investigation.  JSUF Nos. 59, 69.

20          Also during his deposition, Plaintiff testified that he was the owner of the vehicle and that no

21  member of his family had ever owned a Lamborghini kit car, but he later testified that his

22  Lamborghini kit car was registered in his mother's name until January 2008.  Ram Depo Vol. I at

23  37:12-14, 69:16-20, 126:23-25, 204:13-15; Ram Depo Vol. II at 307:2-7.  Although Plaintiff

24  claimed to have purchased the original vehicle in 2005, DMV records show that the vehicle was not

25  registered in his name until January 15, 2008.  JSUF No. 57 (DMV printout at 00526).  However,

26  _____

27          [5]Plaintiff provides no evidentiary support for this argument.

28                                              5

1    Plaintiff maintains that he paid for the vehicle and that at all times the vehicle belonged to him.  Ram

2    Decl. at ¶ 11.

3                          *d.*        *Plaintiff's Income History and Financial Condition*

4           During the EUO, Infinity questioned Plaintiff as to his 2008 income, records for which he did

5    not bring with him.  JSUF No. 44 (Ram EUO at 23:14-24:8).  Plaintiff understood that he was to

6    bring documents evidencing his 2008 income to his EUO.  JSUF No. 41.  Plaintiff testified that he

7    was unable to produce income records for the time period at issue, January-June 2008, because he

8    was paid only in cash.  JSUF No. 44 (Ram EUO at 23:14-24:8).  When asked how much cash he

9    received as income during this time period, Plaintiff stated that he would not provide that

10   information because "that is personal information."  JSUF No. 43; Ram EUO at 24:9-25:11; Ram

11   Depo. Vol. I at 232:4-23.  Ms. Roberts called Plaintiff after the EUO requesting that he produce

12   income records for the year 2008; however, Plaintiff never did so.  Roberts Decl. at ¶ 11.  Although

13   Plaintiff at first stated in his deposition that he had sent his income statements from January through

14   June 2008, he was unable to recall what he sent and admitted that he had no reason to dispute that

15   the only documents that Infinity received from Plaintiff were a set of bank account records, and

16   those did not include any deposits from Plaintiff's alleged employer.  Ram Depo. Vol. II at 395:12-

17   396:24; Roberts Decl. at ¶ 12; Wells Fargo Account Statements (Exhibits 10, 14 to Motion).  When

18   specifically asked if he submitted income records, "meaning documents showing [his] income from

19   an employer," Plaintiff admitted that he did not produce any such records.  Ram Depo. Vol. II at

20   396:25-397:3.

21          Regarding his financial condition, Plaintiff testified at his EUO that he had properties that

22   were foreclosed upon in 2008.  Ram EUO at 30:1-25.  Plaintiff states that in his business of "flipping

23   houses," some properties are permitted to foreclose, and he was not having financial problems at the

24   time of the theft.  Ram Decl. at ¶ 6.  Also during his EUO, Plaintiff admitted that he had

25   approximately $100,000 in credit card debt and that he was behind on payments for his Home Depot

26   credit card.  Ram EUO at 36:21-37:8.

27

28                                                    6

*e.      Plaintiff's Employment History*

During his June 2008 Recorded Statement, Plaintiff stated that he worked for a company called Goldline Silverline and had been employed there for six years.  6/10/08 Recorded Statement at 00165.  Plaintiff again testified regarding his employment at his July 2008 Recorded Statement, stating that he had been working at Goldline Silverline as a business analyst for approximately five years and was earning around $7000 per month.  7/10/08 Recorded Statement at 00176.  In his Affidavit, Plaintiff stated that he was employed at Goldline Silverline, had been employed there for six years, and earned $6500 per month.  Affidavit at 00593.   At his EUO, Plaintiff testified that he had recently been employed as a business analyst at Goldline Silverline; that he had worked there for eight months, not five or six years; and that he had been supervised by a man named Ed Fontaine.  Ram EUO at 20:10-21:7.

Plaintiff produced a 2007 W-2 form indicating that he was a W-2 employee at Goldline Silverline who had earned $90,000 that year.  JSUF No. 2; W-2 form at 0600.  Plaintiff admitted that he intended for Infinity to rely upon the W-2 form he submitted.  JSUF No. 14.

Abida Kahn, the owner of Goldline Silverline, stated in her deposition that she had no record of Plaintiff's employment with her company, that her company has never employed any W-2 employees, and that the taxpayer ID number on the W-2 form submitted by Plaintiff is false.  JSUF Nos. 4, 5, 6.  Ms. Kahn also testified that it was very rare for any of her employees to earn a round number like $90,000 because her employees work on commission, and the company did not round up salaries.  JSUF No. 7.  When asked about the allegedly false taxpayer ID number, Plaintiff stated that he could not dispute Ms. Kahn's testimony.  JSUF No. 13.  Plaintiff later admitted that the W-2 form he submitted to Infinity was a document created for Infinity and that he had never filed the form with the government.  JSUF Nos. 8, 9.  Plaintiff stated that he was a 1099 employee at Goldline Silverline and admitted that as such an employee, he never would have received a W-2.  Ram Depo Vol. I at 130:16-131:1.  Although the W-2 states that Plaintiff earned $90,000, Plaintiff testified that he knew at all times in 2008 that his income for the year 2007 never exceed $50,000.  Ram Depo

1   Vol. II at 389:9-23.  Though Plaintiff stated in his July 2008 Recorded Statement and Affidavit that

2   he had been making approximately $6,500 per month at Goldline Silverline at the time of the alleged

3   theft, he testified in his deposition that he had been paid only $4,993 total in the year 2008 by any

4   employer other than the business he had with his brother.  JSUF No. 15; Ram Depo Vol. II at 390:1-

5   391:2.

6          Plaintiff stated that his supervisor, Ed Fontaine, gave him the W-2 that he produced.  JSUF

7   No. 10.  However, in his deposition, Mr. Fontaine, an employee of Goldline Silverline, denied being

8   Plaintiff's supervisor and denied ever giving a W-2 to Plaintiff.  JSUF Nos. 11, 19.  Mr. Fontaine

9   also testified that he was not in any way affiliated with Goldline Silverline (doing business as Silver

10  Line Finance) in 2007.  Fontaine Depo. at 39:8-10.  Plaintiff claimed that he was getting paid by

11  Goldline Silverline and working for Mr. Fontaine "under the table."  Ram Depo Vol. I at 180:9-12.

12  However, when asked whether he would dispute Mr. Fontaine's testimony that Mr. Fontaine never

13  paid him "under the table" at Goldline Silverline, Plaintiff stated that he would not.  Ram Depo Vol.

14  II at 296:22-25.  Plaintiff also admitted that Mr. Fontaine was not his supervisor.  JSUF No. 20.

15         Despite his testimony regarding his work at Goldline Silverline at various points in the

16  investigation, Plaintiff admitted that his statements that he had worked at Goldline Silverline for five

17  or six years were false.  JSUF No. 23 (Ram Depo. Vol. I at 256:6-13).  From October 2002 through

18  November 2007, Plaintiff admitted that he worked *exclusively* for a company called JSW Insurance.

19  JSUF No. 24 (Ram Depo Vol. I at 171:14-17).  From November 5, 2007, through January 2008,

20  Plaintiff worked at an insurance company called Burns & Wilcox.  JSUF No. 25.  Plaintiff was

21  employed with Burns & Wilcox through January 11, 2008, and was not paid in cash.[6]  JSUF No. 47;

22  Ram Depo. Vol. I at 175:2-4, 229:6-9, 228:13-20.  Plaintiff's 2008 W-2 from Burns & Wilcox

23  shows that he earned $4,992.83, but he did not produce any 2008 income records from this

24  company.  Ram Depo Vol. I at 178:17-24; JSUF No. 44.  Plaintiff stated that he did not produce

25

26         [6]Plaintiff's final day at Burns & Wilcox was either January 11, 2008, or January 18, 2008.  *See*

27  Ram Depo Vol. I at 178:1-3; Ram Depo Vol. I at 229:6-9.

28                                                    8

income records from Burns & Wilcox because he was unsure of the date on which he last worked there, but he admits that Infinity's request for his 2008 income records should have resulted in his providing 2008 income records from that company. Ram Depo. Vol. I at 229:10-14, 21-25. Plaintiff testified that he did not know if he began working for Goldline Silverline in January of 2008, but he did not declare any income on his 2008 tax return from Goldline Silverline. JSUF Nos. 26, 27. Between late January 2008 and the summer of 2008, Plaintiff admitted that his only place of employment was a family-related construction business. JSUF No. 30. During that same time period, Plaintiff applied for and received $17,550 in unemployment benefits. JSUF No. 31 (Ram Depo Vol. II at 391:6-15).

<em>f.   Plaintiff's Statements Regarding History of Vehicle Theft</em>

At his June 2008 Recorded Statement, Plaintiff told Infinity that he had never been the victim of a prior vehicle theft. 6/10/08 Recorded Statement at 00165. During his EUO, Plaintiff again stated that he had never been the victim of a vehicle theft. JSUF No. 35 (Ram EUO at 37:24-38:1). Plaintiff admits that he intended for Infinity to rely upon this statement. JSUF No. 36 (Ram Depo. Vol. I at 194:1-9).

During the investigation of Plaintiff's claim, Infinity produced electronic records showing that Plaintiff reported the theft of a Hummer in 2003. JSUF No. 34. Plaintiff admitted that at all times in 2008, he knew he had reported the loss of a Hummer in 2003. JSUF No. 37 (Ram Depo Vol. II at 380:18-23). Plaintiff testified that having the Hummer stolen in 2003 was not a "memorable event" for him. Ram Depo. Vol. II at 382:22-23. Defendant notes that the 2003 and 2008 vehicle theft claims both involved cars allegedly stolen while Plaintiff was out to dinner with a friend. Ram Depo Vol. II at 382:12-15.

<em>g.   Plaintiff's Prior Vehicle Insurance</em>

Plaintiff listed his prior insurance company on his Affidavit as "Hagerty Insurance." JSUF No. 32 (Affidavit at 00595). At his EUO, Plaintiff testified that prior to insuring the Lamborghini kit car with Infinity, he had insured the vehicle with Hagerty Insurance. JSUF No. 32 (Ram EUO at

United States District Court

For the Northern District of California

45:14-22).  Plaintiff stated that he purchased the insurance policy with Hagerty right after he bought the kit car.   Ram EUO at 45:14-25.

At his deposition, however, Plaintiff stated that his testimony that he had previously insured the vehicle with Hagerty Insurance was false, and he had never received a policy from Hagerty. Ram Depo Vol. I at 244:15-245:11.  When asked if he knew his testimony as to Hagerty Insurance was false at the time he gave it, Plaintiff responded, "Well, I thought I had it, but I didn't."  *Id.* at 244:21-23.  When pressed to explain, Plaintiff admitted that at the time he provided his testimony as to Hagerty, he knew it was not true.  *Id.* at 245:2-11.

h.      *Vehicle Repairs and Maintenance*

Plaintiff stated at his EUO that he spent approximately $25,000 on vehicle repairs and maintenance – $10,000 at Perfect Auto and $15,000 at Turbo Hoses, both located in Fremont, CA. Ram EUO at 46:19-25, 49:14-25.  Adding together the $75,000 purchase price with the $25,000 spent on maintenance, Plaintiff stated that he spent approximately $100,000 total on the vehicle.  *Id.* at 51:11-13.

During the investigation of his claim, Plaintiff was able to produce repair receipts from a company called Turbo Hoses, though those receipts did not contain a vehicle identification number or a license plate number.  JSUF Nos. 61, 62; Ram Depo Vol. I at 101:10-13.  Though Plaintiff testified that he spent $100,000 on the vehicle in total – $75,000 on the purchase and $25,000 for repairs – he later stated at his deposition that that number did not include the $10,000 he spent to have the kit car transferred to a new chassis in 2007.  JSUF No. 68.  When questioned about this testimony, Plaintiff made clear that he didn't "know the exact number" that he spent on the vehicle. Ram Depo Vol. I at 249:8-9.

i.      *Damages*

Plaintiff testified at his deposition that he was not damaged financially by Infinity's denial of his vehicle theft claim.  When asked how he has been damaged by Infinity's denial, Plaintiff responded, "I haven't been damaged at all.  Just going through this whole process."  Ram Depo Vol.

10

1   I at 269:18-21.  Ram testified that he suffered emotional distress damages, including the time he

2   took off work to attend his deposition, and that those emotional damages were the only damages he

3   suffered.  Ram Depo Vol. I at 270:1-5, 271:6-14.  Plaintiff opposes Defendant's characterization of

4   Plaintiff's damages, asserting that when Plaintiff made these statements, he was not referring to the

5   economic loss of the vehicle.  Opposition at ¶ II.G.

6          **B.     Procedural History**

7          On April 6, 2009, Plaintiff filed a complaint in state court alleging breach of contract, breach

8   of the implied covenant of good faith and fair dealing, and unfair business practices (pursuant to

9   California Business and Professions Code section 17200).  Plaintiff sought compensatory damages,

10  emotional distress damages, attorneys' fees and costs, punitive damages, injunctive relief,

11  restitution, and pre-judgment and post-judgment interest.  Defendant removed this action to federal

12  court on June 19, 2009, pursuant to 28 U.S.C. § 1441(a).  The third cause of action for unfair

13  business practices was dismissed with prejudice by stipulation of the parties on March 25, 2011.

14         On April 5, 2011, Defendant filed its "Motion for Summary Judgment; or, in the Alternative,

15  Partial Summary Judgment."  Plaintiff opposes the Motion.

16         **C.     The Motion**

17         Defendant asserts in its motion that Plaintiff's claims lack merit and fail as a matter of law.

18  Defendant argues that Plaintiff cannot prevail on his claims because Plaintiff's insurance policy

19  precludes coverage where the insured makes fraudulent statements or engages in fraudulent activity

20  in connection with any loss, and Plaintiff has made such false statements and engaged in fraudulent

21  activities throughout the investigation of this claim.  As a second ground for summary judgment,

22  Defendant argues that Plaintiff's claims lack merit and are barred because the policy contains a

23  provision precluding coverage where the insured has failed to cooperate in the investigation of the

24  claim.  Defendant asserts that Plaintiff has failed to cooperate in the investigation of this claim, and

25  that this failure has prejudiced Infinity.  In addition, Defendant argues that Plaintiff's claims fail as a

26  matter of law because he has not suffered economic harm.

27

28                                              11

United States District Court
For the Northern District of California

1    In the alternative, Defendant argues that it should be granted partial summary judgment on

2  Plaintiff's claim for breach of the implied covenant of good faith and fair dealing because there was

3  a genuine dispute as to coverage liability, and it was reasonable for Infinity to withhold payment on

4  the claim.  Regarding Plaintiff's claim for punitive damages, Defendant asserts that it is entitled to

5  partial summary judgment because Plaintiff has failed to produce evidence of malice, oppression, or

6  fraud.

7    In his opposition, Plaintiff opposes Defendant's characterization of his testimony and argues

8  that although he may have made mistakes during the investigation of the claim, he did not make

9  material false statements.  In addition, Plaintiff argues that he fully cooperated in the investigation.

10  Regarding the bad faith claim, Plaintiff asserts that any dispute over the reliability of Plaintiff's

11  claim was not genuine because a jury could conclude that Infinity acted unreasonably.

12  **III.    ANALYSIS**

13      **A.    Legal Standard – The Summary Judgment Motion**

14    Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

15  and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

16  any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ.

17  P. 56(c).  In order to prevail, a party moving for summary judgment must show the absence of a

18  genuine issue of material fact with respect to an essential element of the non-moving party's claim,

19  or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *Celotex*

20  *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Further, "*Celotex* requires that for issues on which the

21  movant would bear the burden of proof at trial, that party must show affirmatively the absence of a

22  genuine issue of material fact," that is, "that, on all the essential elements of its case on which it

23  bears the burden of proof at trial, no reasonable jury could find for the non-moving party."

24  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993).  Once the movant has made this

25  showing, the burden then shifts to the party opposing summary judgment to designate "specific facts

26  showing there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324.  On summary judgment, the

27

28                                          12

court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

**B.      Breach of Contract**

       **1.      Legal Standard – Fraud and Concealment Provisions in Insurance Contracts**

A fraud and concealment provision in an insurance contract will generally void the policy where an insured attempts to defraud the insurer. *Leasure v. MSI Ins. Co.*, 65 Cal. App. 4th 244, 248 (1998). An attempt to defraud or deceive the insurer may take place in an application to obtain insurance coverage or in an attempt to obtain benefits. *Id.* However, in order to void the policy, the insured's misrepresentation must relate to a material matter. *Id. See also Claflin v. Commonwealth Ins. of Boston, Mass.*, 110 U.S. 81, 94-95 (1884); *Cummings v. Fire Ins. Exch.*, 202 Cal. App. 3d 1407, 1416 (1988). Moreover, an untrue statement must be knowingly and intentionally made, with the intent to deceive or defraud the insurer, to void the policy. *Pedrotti v. Am. Nat'l Fire Ins. Co. of Columbus, Ohio*, 90 Cal. App. 668, 671 (1928). *See also Claflin*, 110 U.S. at 95; *Cummings*, 202 Cal. App. 3d at 1416-17. Thus, where a plaintiff knowingly and wilfully, with intent to deceive the insurer, makes false statements as to material matters in the course of the insurer's investigation of his claim, the defendant is entitled to summary judgment on the plaintiff's breach of contract claim. *Cummings*, 202 Cal. App. 3d at 1418-19.

Whether a false statement was in fact made is generally a question of fact to be decided by the jury. *Pedrotti*, 90 Cal. App. at 671. However, where a plaintiff admits to making false statements with the intent that his insurer rely on those statements, the issue of whether such false statements were made need not be tried. *Cummings*, 202 Cal. App. 3d at 1417. Similarly, whether a false statement was made knowingly and with the intent to deceive the insurer is usually a question of fact but may be decided as a matter of law where the insured admits that he made knowingly false statements with the intent that the insurer rely upon them. *Pedrotti*, 90 Cal. App. at 671; *Cummings*, 202 Cal. App. 3d at 1417. The intent to defraud is necessarily implied "when the misrepresentation is material and the insured wilfully makes it with knowledge of its falsity." *Cummings*, 202 Cal.

13

App. 3d at 1418 (discussing *Claflin*, 110 U.S. at 95).

Whether a false statement is material depends upon "its prospective reasonable relevance to the insurer's inquiry." *Cummings*, 202 Cal. App. 3d at 1417.  If an insured's misrepresentation "concerns a subject reasonably relevant to the insured's investigation, and if a reasonable insurer would attach importance to the fact misrepresented, then it is material." *Id.* (citing *Fine v. Bellefonte*, 725 F.2d 179, 183 (2d Cir. 1984)).  As the Supreme Court noted:

> The object of the provisions in the policies of insurance, requiring the assured to submit himself to an examination under oath, to be reduced to writing, was to enable the company to possess itself of all knowledge, and all information as to other sources and means of knowledge, in regard to the facts, material to their rights, to enable them to decide upon their obligations, and to protect them against false claims.  And every interrogatory that was relevant and pertinent in such an examination was material, in the sense that a true answer to it was of the substance of the obligation of the assured.  A false answer as to any matter of fact material to the inquiry, would be fraudulent.

*Claflin*, 110 U.S. at 94-95.  An investigation, including a recorded statement, affidavit vehicle theft, and EUO, enables an insurance company to gain the information necessary to determine whether benefits are due under the policy, and a false statement as to a matter relevant to such an investigation is material.  Thus, if Plaintiff's false statements related to matters reasonably relevant to Infinity's investigation of his claim and determination of its obligations under the policy, Plaintiff's statements were material.  *Leasure*, 65 Cal. App. 4th at 248.  Materiality is generally a mixed question of law and fact; however, it may be decided as a matter of law if reasonable minds could not differ as to the materiality of the misrepresentation. *Cummings*, 202 Cal. App. 3d at 1417.  *See also Long v. Ins. Co. of North America*, 670 F.2d 930, 934 (10th Cir. 1982); *Cont'l Cas. Co. v. Scully*, No. 09-CV-1970 W(NLS), 2010 WL 2736078, at *4 (S.D. Cal. July 12, 2010).

### 2.   Application of the Law to the Facts of the Case

#### a.   *Plaintiff's False Statements*

Plaintiff admits to making false statements during the investigation of his vehicle theft claim and admits that he intended for Infinity to rely on the statements he made in his Recorded Statement, Affidavit, and EUO.  Regarding his income and employment history, Plaintiff produced a W-2

United States District Court

For the Northern District of California

1   evidencing that he earned $90,000 in 2007, but he later admitted that he knew at all times in 2008

2   that his income for that year never exceeded $50,000.  Ram Depo. Vol. II at 389:21-23.  The W-2

3   was in fact a document created for Infinity and never submitted to the government, and Plaintiff

4   admits that he intended for Infinity to rely on it.  JSUF Nos. 8, 9, 14.  Plaintiff admitted at his

5   deposition that his statements that he had worked for Goldline Silverline for five or six years were

6   false.  JSUF No. 23.  Plaintiff also admits that the information he provided at his EUO and in his

7   Affidavit regarding his previous car insurance with Hagerty Insurance was false; Plaintiff's vehicle

8   was not insured with Hagerty, and Plaintiff admitted to knowing this at the time he testified.  Ram

9   Depo. Vol. I at 245:2-11.  Finally, Plaintiff admits that despite his testimony that he had never been

10  the victim of a vehicle theft, he knew at all times in 2008 that he had reported the theft of a Hummer

11  in 2003.  JSUF No. 37.  In his responses to Defendant's Requests for Admission, Plaintiff admits

12  that he intended for Infinity to rely upon all the statements made in his Recorded Statement,

13  Affidavit, and EUO.  JSUF Nos. 16, 18, 22, 29, 33, 36.

14       Plaintiff now asserts in his Opposition to Defendant's Motion, supported by his Declaration,

15  that although he made mistakes in his "initial interrogation," admitting to a mistake is not the

16  equivalent of admitting to false testimony.  Ram Decl. at ¶ 10; Opposition at ¶ II.F.  Plaintiff states

17  that he made these mistakes because he was nervous and under great stress during this initial

18  interrogation, making him unable to accurately recall certain details.  Ram Decl. at ¶ 10.

19       However, as Defendant points out, this portion of Plaintiff's Declaration is not sufficient to

20  create a genuine issue of material fact.  First, Plaintiff fails to identify the specific "mistakes" he

21  now claims to have made.  Plaintiff has not identified "specific facts showing there is a genuine

22  issue for trial."  *Celotex*, 477 U.S. at 324.  Second, Plaintiff provided this "mistaken" testimony not

23  only at his "initial interrogation" but in his Affidavit and EUO as well.  Third, while it is true that

24  making a mistake and admitting to false testimony are not equivalent, the record shows that Plaintiff

25  has specifically admitted to providing false testimony as to multiple matters and *stipulated* to some

26  of those false statements in the parties' Joint Statement of Undisputed Facts: "Q: So, in response to

27

28                                                      15

**United States District Court**
For the Northern District of California

1   the recorded statement, the affidavit of theft and in the EUO, you said all three times that you

2   worked at Goldline Silverline for five or six years; correct?  A: Yes.  Q: And all three times those

3   answers were false, correct?  A: Yes."  JSUF No. 23 (Ram Depo Vol. I at 256:6-13).  Plaintiff

4   further testified: "Q: So in 2003 you reported the theft of a Hummer that was registered in your

5   name, correct?  A: Yes.  Q: And you were aware at all times in 2008 that you had a Hummer stolen,

6   correct?  A: Yes."  JSUF No. 37 (Ram Depo Vol. II at 380:18-23).  Generally, a party is bound by

7   its stipulation of the facts.  *Block v. City of Los Angeles*, 253 F.3d 410, 419 fn. 2 (9th Cir. 2001)

8   (citing *Holland Livestock Ranch v. United States*, 714 F.2d 90, 93 (9th Cir. 1983)).  Therefore,

9   Plaintiff is bound to his admissions of false testimony as to his work at Goldline Silverline and the

10  prior vehicle theft claim.        The Court rejects Plaintiff's argument for an additional reason – the

11  Court finds portions of Plaintiff's Declaration to be "sham" testimony and accordingly disregards

12  them.  At summary judgment, a district court may "disregard 'sham' affidavits that contradict

13  deposition testimony submitted solely to generate [an] issue of fact for summary judgment

14  purposes."  *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 728 (9th Cir. 1997) (citing *Kennedy v.*

15  *Allied Mut. Ins. Co.*, 952 F.2d 262, 266-67 (9th Cir. 1991)).  In order to do so, a court must make a

16  "factual determination that the contradiction was actually a sham."  *Id.* (internal quotations omitted).

17  In making this determination, the Court must consider whether "the party submitting the affidavit or

18  declaration provides a sufficient explanation for the contradiction."  *Martinez v. Marin Sanitary*

19  *Serv.*, 349 F. Supp. 2d 1234, 1242 (N.D. Cal. 2004).  A declaration that contradicts earlier sworn

20  testimony will not be considered a sham when it is offered to elaborate, explain, or clarify earlier

21  deposition testimony in the context of an honest discrepancy, mistake, or newly discovered

22  evidence.  *Messick v. Horizon Indus., Inc.*, 62 F.3d 1227, 1231 (9th Cir. 1995).

23        In this case, the Court finds that Plaintiff's Declaration contradicts his earlier testimony, and

24  Plaintiff does not provide a sufficient explanation for the contradiction.  During discovery, Plaintiff

25  admitted to providing knowingly false testimony, but he now states in his Declaration that he merely

26  made "some mistakes."  Ram Decl. at ¶ 10.  Plaintiff would have had to make mistakes as to his

27

28                                                    16

United States District Court

For the Northern District of California

1    employment, income, prior insurance, and vehicle theft history on two if not three separate

2    occasions, as he provided sworn testimony in his Recorded Statements, Affidavit, and EUO.

3    Moreover, these separate occasions provided Plaintiff with the opportunity to correct his testimony

4    once he realized that he had made mistakes, but the record does not show that Plaintiff made any

5    attempt to do so.  Plaintiff admitted in his Response to Defendant's Request for Admission, Set Two,

6    No. 35, that he made no changes to his EUO transcript.  Although Plaintiff's Declaration is offered

7    to explain earlier deposition testimony (Plaintiff states that he made mistakes because he was

8    nervous and under great stress), Plaintiff points to no place in the record where his recall may have

9    been impaired.  Plaintiff asserts in his Declaration that he worked at many different companies in the

10    years leading up to the theft and did his best to recall them under "great pressure," but Plaintiff does

11    not offer an explanation as to how such pressure could cause him to forget his current employer.

12    Ram Decl. at ¶ 12.  This portion of Plaintiff's Declaration contradicts his prior admissions of false

13    testimony, given on multiple occasions, and the Court is unpersuaded that it is offered in the context

14    of an honest mistake.

15                 *b.*       *Materiality of Plaintiff's False Statements*

16         The Court finds that at least some of Plaintiff's false statements related to matters relevant to

17    Infinity's investigation of his claim and determination of its coverage liability.  A reasonable insurer,

18    confronted with suspicious circumstances surrounding a vehicle theft claim, would find false

19    statements as to employment history and income relevant to its investigation of the claim.  Plaintiff's

20    testimony that he was employed at Goldline Silverline for five or six years and had earned $90,000

21    in 2007 would lead a reasonable insurer to believe that (1) he was able to afford the $95,000

22    Lamborghini he had insured with the company and (2) he would not likely have had a motive to file

23    a false claim.  Plaintiff was in fact receiving unemployment benefits despite his testimony as to his

24    employment and salary at Goldline Silverline, and that information is likely relevant to a reasonable

25    insurer's determination of its proper course of action regarding a vehicle theft claim that it has

26    reason to believe may be fraudulent.  A reasonable insurer would also find it relevant that its insured

27

28                                      17

United States District Court

For the Northern District of California

1   had not previously insured the vehicle in question.  An insured who did in fact own a $95,000 car is

2   likely to have insured the vehicle within a reasonable time from the date of the purchase.

3                          c.      *Plaintiff's Intent*

4           The issue of Plaintiff's intent need not be tried because, as previously discussed, he admits to

5   making knowingly false statements with the intent that Infinity rely on those statements.  Plaintiff

6   testified that all three times he stated that he worked at Goldline Silverline for five or six years, those

7   answers were false.  JSUF No. 23 (Ram Depo. Vol. I at 256:6-13).  Despite the W-2, created for

8   Infinity, evidencing that he earned $90,000 in 2007, Plaintiff admitted that he knew at all times in

9   2008 that his income for 2007 never exceeded $50,000.  Ram Depo. Vol. II at 389:21-23.  He also

10  testified that despite his statements that he had never been the victim of a prior vehicle theft, he was

11  aware at all times in 2008 that he had reported the loss of a Hummer in 2008.  JSUF No. 37 (Ram

12  Depo. Vol. II at 380:18-23).  In addition, Plaintiff testified that at the time he stated that Hagerty

13  Insurance had previously insured his kit car, he knew it was not true.  Ram Depo. Vol. I at 245:8-11.

14  Plaintiff intended for Infinity to rely on these knowingly false statements.  JSUF Nos. 16, 18, 22, 29,

15  33, and 36.  Therefore, the Court concludes as a matter of law that Plaintiff intended to deceive

16  Infinity.

17          In summary, the Court finds that there is no genuine dispute for trial on the question of

18  whether Plaintiff has breached the insurance contract by making knowingly false statements as to

19  material matters with the intent to deceive Infinity.  Accordingly, Defendant's Motion for Summary

20  Judgment as to Plaintiff's breach of contract claim is GRANTED.

21          **3.      Plaintiff's Breach of the Duty to Cooperate Voids the Insurance Contract**

22          Plaintiff's breach of contract claim fails for an additional reason – his breach of the duty to

23  cooperate with Infinity in its investigation of his claim.

24                          a.      *Legal Standard – Duty to Cooperate*

25          California courts have upheld the validity of cooperation clauses in insurance policies in the

26  context of submission to an examination under oath as well as cooperation during such an

27

28                                          18

United States District Court

For the Northern District of California

1    examination.  *See Hickman v. London Assurance Corp.*, 184 Cal. 524 (1920); *Adbelhamid v. Fire*

2    *Ins. Exch.*, 182 Cal. App. 4th 990 (2010); *Brizuela v. CalFarm Ins. Co.*, 116 Cal. App. 4th 578

3    (2004); *Robinson v. Nat'l Auto. and Cas. Ins. Co.*, 132 Cal. App. 2d 709 (1955).  A clause requiring

4    that an insured submit to an EUO as often as required and generally cooperate in the investigation of

5    any loss allows the insurer to gather the facts necessary to determine its obligations.  In *Hickman*,

6    the California Supreme Court stated that such provisions are "reasonable and valid":

7            As the facts with respect to the amount and circumstances of a loss are almost entirely within
             the sole knowledge of the insured, and the opportunity and temptation to perpetrate a fraud
8            upon the insurer is often great, it is necessary that it have some means of cross-examining, as
             it were, upon the written statement and proofs of the insured, for the purpose of getting at the
9            exact facts before paying the sum claimed of it.

10   *Hickman*, 184 Cal. at 529-30.

11          Failure to comply with a provision in an insurance policy requiring the insured to sit for an

12   examination under oath constitutes a breach of the duty to cooperate and therefore a breach of the

13   insurance contract.  *Brizuela*, 116 Cal. App. 4th at 587 (citing *Hickman*, 184 Cal. at 533-34).  An

14   insured also breaches the duty to cooperate by failing to answer material questions during an EUO.

15   *Abdelhamid*, 182 Cal. App. 4th at 1001 (citing 13 Couch on Insurance § 196:24 (3d ed. 1999)).  In

16   addition, an insured breaches the duty to cooperate where she sits for an EUO but refuses to produce

17   sufficient records, including financial, car payment, and maintenance records.  *Martinez v. Infinity*

18   *Ins. Co.*, 714 F. Supp. 2d 1057, 1063 (C.D. Cal. 2010).

19          "[I]n the context of cooperation that *does not* involve submission to an under oath

20   examination, California courts have required a showing that the insurer was prejudiced in its

21   investigation by the insured's failure to cooperate" in order to void the policy.  *Martinez*, 714 F.

22   Supp. 2d at 1061-62 (emphasis in original).  *See also Othman v. Globe Indem. Co.*, 759 F.2d 1458,

23   1465 (9th Cir. 1985), overruled on other grounds by *Bryant v. Ford Motor Co.*, 832 F.2d 1080 (9th

24   Cir. 1987) ("an insurer may deny coverage on the basis of the insured's refusal to cooperate if it is

25   substantially prejudiced by the refusal"); *Brizuela*, 116 Cal. App. 4th at 591.  In contrast to the

26   refusal to submit to an examination, which is necessarily prejudicial to the insurer, refusal to

27

28                                                   19

cooperate as to particular matters during that examination may be significant or may be trivial, therefore requiring the insurer to show that it has been prejudiced. *Brizuela*, 116 Cal. App. 4th at 591. When an insured refuses to produce records and answer questions as to his financial condition, the insurer may suffer prejudice because it is unable to thoroughly investigate the claim and determine its proper course of action. *Abdelhamid*, 182 Cal. App. 4th at 1007.

Generally, a determination as to whether an insured breached his duty to cooperate and whether an insurer was prejudiced by that breach are questions of fact. *Martinez*, 714 F. Supp. 2d at 1062. However, if the facts of the case are "uniformly unfavorable" to one party, breach of the duty to cooperate may be determined as a matter of law. *Id.* (citing *Ania v. Allstate Ins. Co.*, 161 F. Supp. 2d 424, 427-28 (E.D.Pa. 2001)). If a court finds as a matter of law that the insured has breached her duty to cooperate and the insurer was prejudiced by that breach, the insurer is entitled to summary judgment on the insured's breach of contract claim. *See, e.g.*, *Abdelhamid*, 182 Cal. App. 4th at 1002, 1007; *Martinez*, 714 F. Supp. 2d at 1063.

b.      Application of the Law to the Facts of the Case

The Court finds that there is no genuine dispute on the question of whether Plaintiff cooperated with the investigation of the insurance claim. It is undisputed that Plaintiff sat for an examination under oath on September 10, 2008. Thus, in order to prevail on its Motion for Summary Judgment on this ground, Defendant must show that Plaintiff breached his duty to cooperate by failing to answer material questions and/or produce records and that Defendant was prejudiced by that failure. The Court concludes that Defendant has satisfied its burden.

Plaintiff breached the duty to cooperate when he failed to answer to material questions at his EUO. During his EUO, Plaintiff claimed that all of his 2008 income was cash, and when asked to approximate how much cash, he stated that "that is personal information." JSUF No. 43; Ram EUO at 24:9-25:11. Even if Plaintiff were unable to obtain any records of his 2008 income, the duty to cooperate requires that he at least answer questions to the best of his ability regarding such income, which is relevant to the insurer's investigation of his claim because it allows the insurer to develop

United States District Court
For the Northern District of California

**United States District Court**

For the Northern District of California

1    circumstantial evidence of fraud.  Although Plaintiff provided some testimony regarding his

2    mortgage payments, employment, and salary at his Recorded Statements and Affidavit, much of that

3    employment and salary information is admittedly false and does not constitute cooperation.[7]

4         *Abdelhamid*, the case upon which Defendant relies, is on point.  In that case, the plaintiff

5    filed a claim with defendant Fire Insurance Exchange (FIE) for the loss of her home due to fire.

6    *Abdelhamid*, 182 Cal. App. 4th at 993.  An initial investigation into the claim revealed certain

7    suspicious circumstances that led FIE to request that the plaintiff complete a proof of loss, produce

8    documents, and submit to an EUO.  *Id.* at 993, 994-95.  During the investigation of her claim, the

9    plaintiff produced limited records.  *Id.* at 995.  At her EUO, the plaintiff repeatedly declined to

10   answer questions relating to her personal and business finances, answering only limited questions in

11   relation to her bankruptcy and no questions regarding receipt of government assistance.  *Id.* at 996.

12   FIE denied the plaintiff's claim based on her refusal to cooperate, and the plaintiff filed suit.  *Id.* at

13   996, 998.  The Court of Appeal affirmed the lower court's grant of summary judgment for FIE and

14   held that "where an insurer has reason to suspect arson, it is relevant and material to inquire into the

15   financial condition of the insured because an insurer is entitled to develop circumstantial evidence of

16   the insured's involvement in the suspected arson."  *Id.* at 1001 (citing 13 Couch on Insurance §

17   196:11).  The plaintiff's refusal to answer material questions constituted a material breach of the

18   insurance contract.  *Id.*

19        Similarly, in the present case, where an insured has reason to suspect fraud in relation to a

20   theft claim, inquiries into the insured's financial status are relevant and material, and a refusal to

21   answer questions on that subject constitutes a material breach of the insurance contract.  Plaintiff

22   refused to discuss his 2008 income at his EUO, and much of the income and employment

23   information that he was willing to provide throughout the investigation of his claim is admittedly

24   false.  The Court finds that Plaintiff's failure to answer income questions constitutes a breach of the

25   _____

26        [7]Plaintiff provided testimony as to his properties in foreclosure as well as his credit card debt
     during his EUO.  Though that information is relevant to Plaintiff's financial condition, Plaintiff
27   nonetheless failed to answer questions as to his income.

28                                      21

United States District Court

For the Northern District of California

1    duty to cooperate, and no reasonable juror could find otherwise.

2         In addition, Plaintiff breached his duty to cooperate when he failed to produce the records

3    requested by Infinity.  Plaintiff stated at his EUO that he was unable to produce income records for

4    the period January 2008 through June 2008 because he was paid only in cash.  JSUF No. 44.  While

5    Plaintiff could not produce records that he did not have, the record shows that Plaintiff was

6    employed at Burns & Wilcox through January 11 or 18, 2008, and that Burns & Wilcox did not pay

7    him in cash.  JSUF No. 47; Ram Depo. Vol. I at 229:6-9, 178:1-3.  Plaintiff received a W-2 from

8    Burns & Wilcox showing that he earned $4,992.83 in 2008.  Ram Depo. Vol. I at 178:17-24.

9    Although Plaintiff testified that he did not produce Burns & Wilcox income records for this time

10   period because he was unsure on which date he ceased working at the company, Plaintiff admitted

11   that Infinity's request for his 2008 income records should have resulted in the production of his

12   records from this employer.  Ram Depo. Vol. I at 229:21-25; JSUF No. 46 (Ram Depo. Vol. I at

13   229:10-14).  In addition, Plaintiff could have produced records of his unemployment benefits or

14   some record of his income from his family-related construction business or his business of flipping

15   houses.

16        The Court notes that Plaintiff produced monthly bank statements for February through

17   September 2008, as well as numerous maintenance receipts dated throughout 2007.[8]  But as Infinity

18   points out, these records are insufficient.  The bank account records did not show any deposits from

19   Ram's alleged employer, Goldline Silverline.  Roberts Decl. at ¶ 12; Wells Fargo Account

20   Statements (Exhibits 10, 14 to Motion).  Similarly, because the maintenance receipts did not show a

21   VIN or license plate number, Infinity did not consider them adequate evidence to support Plaintiff's

22   vehicle theft claim.  Roberts Decl. at ¶ 13.  The records that Plaintiff was willing to submit are

23   _____

24        [8]Exhibit 14 to Defendant's Motion, "Redacted Wells Fargo Bank account statements submitted
     from Jagat Ram to Infinity," consists only of account statements for the time period April 8, 2008,
25   through May 7, 2008, suggesting that these were the only bank statements submitted to Infinity during
     the investigation.  However, Exhibit 29 to Defendant's Requests for Admission to Plaintiff, Set Two,
26   consists of redacted Wells Fargo Bank account statements dated throughout 2008.  It is unclear whether
     these additional account statements were produced during the investigation of the claim or during
27   discovery.

28                                                        22

United States District Court

For the Northern District of California

1    insufficient to allow a thorough investigation of his claim, especially in light of the fact that Plaintiff

2    was unable to produce any evidence of the purchase price of the vehicle.  The Court finds that

3    Plaintiff's failure to produce records amounts to a breach of the duty to cooperate.

4            In his Declaration, Plaintiff states that he produced all evidence of income in his possession

5    at his EUO.  Ram Decl. at ¶ 8.  However, Plaintiff admits that Infinity's request included and should

6    have resulted in the production of his 2008 Burns & Wilcox income records.  JSUF No. 46; Ram

7    Depo. Vol. I at 229:10-14.  Also, the fact remains that Plaintiff did not produce records related to his

8    unemployment, construction business, or house-flipping activities, and he offers no explanation or

9    evidence regarding that failure.

10           Plaintiff's failure to answer material questions and produce income records caused prejudice

11   to Infinity.  As in *Abdelhamid*, Infinity sought Plaintiff's financial information as a means of

12   determining whether his claim was valid, and Plaintiff's failure to provide records and accurate

13   testimony prejudiced Infinity by making it difficult if not impossible to determine whether Plaintiff

14   had motive to file a false claim.  The court in *Abdelhamid* stated that while information regarding the

15   plaintiff's claimed losses was essential to determine the extent of her claim,

16           FIE's requested documentation and queries regarding [the plaintiff's] financial status were,
         however, even more fundamental.  The financial information FIE sought went to the heart of
17       its investigation of whether there was circumstantial evidence of Abdelhamid's involvement
         in the arson of her home or whether there was a reasonable explanation for the many
18       suspicious circumstances uncovered by FIE's investigation.  This addressed the very validity
         of her claim.

19

20   *Abdelhamid*, 182 Cal. App. 4th at 1007.  Plaintiff deprived Infinity of the opportunity to fully

21   investigate his claim and admitted in his deposition that he did not know how Infinity could

22   determine whether he had a motive to file a false claim without obtaining his income records.  JSUF

23   No. 48.  Because Plaintiff breached his duty to cooperate and no reasonable juror could find that

24   Infinity was not prejudiced by that breach, Defendant is entitled to summary judgment on Plaintiff'

25   breach of contract claim.

26           In summary, the Court finds that the insurance policy is void based on Plaintiff's breach of

27

28                                                          23

**United States District Court**
For the Northern District of California

1    the duty to cooperate.  Accordingly, summary judgment as to Plaintiff's breach of contract claim is

2    GRANTED.

3          **C.**        **Breach of the Implied Covenant of Good Faith and Fair Dealing**

4             **1.**       **Legal standard**

5        Generally, an insured has no claim for breach of the implied covenant of good faith and fair

6    dealing against his insurer unless policy benefits are due because "the covenant is based on the

7    contractual relationship between the insured and the insurer."  *Waller v. Truck Ins. Exch.*, 11 Cal.

8    4th 1, 36 (1995).  *See also Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1153 (1990).  The

9    implied covenant supplements an express contract.  *Id.* (citing *Love*, 221 Cal. App. 3d at 1153).

10    Therefore, absent a contractual right to benefits due under the policy, "the implied covenant has

11    nothing upon which to act as a supplement, and should not be endowed with an existence

12    independent of its contractual underpinnings."  *Id.* (internal quotations omitted).  However,

13    California courts have addressed certain circumstances in which a claim for breach of the implied

14    covenant of good faith and fair dealing might survive despite the absence of a valid breach of

15    contract claim.  *See Brizuela*, 116 Cal. App. 4th at 594-95.  For example, an insured may have a

16    claim against his insurer for breach of the implied covenant despite the lack of a breach of contract

17    claim where the insurer induced the plaintiff not to appear for his EUO (*see Gruenberg v. Aetna Ins.*

18    *Co.*, 9 Cal. 3d 566, 578 fn. 9 (1973)); where the insurer did not investigate a non-covered claim but

19    worked to intimidate the insured into settling (*see Brizuela*, 116 Cal. App. 4th at 594 (citing Stephen

20    S. Ashley, <u>Bad Faith Actions Liability and Damages</u> § 5A:2 (2d ed. 1997)); or where an insurer

21    unreasonably delayed the investigation of a non-covered claim (*see Brizuela*, 116 Cal. App. 4th at

22    594 (citing *Murray v. State Farm Fire & Cas. Co.*, 219 Cal. App. 3d 58, 65-66 (1990)).

23             **2.**       **Application of the Law to the Facts of the Case**

24        Because Plaintiff's breach of contract claim fails as a matter of law, Plaintiff's bad faith

25    claim fails as well.  Although California courts have identified specific exceptions to the rule that a

26    plaintiff may not bring a claim for breach of the implied covenant of good faith and fair dealing

27

28                                                24

absent a valid breach of contract claim, none of those circumstances is present in this case. Accordingly, Defendant's motion for summary judgment as to Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is GRANTED.

    **D.**    **Punitive Damages**

        **1.**    **Because Plaintiff's Bad Faith Claim Fails as a Matter of Law, his Related Punitive Damages Claim Must Fail**

California Civil Code section 3294(a) (West 2011) provides that "in an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice," the plaintiff may recover punitive damages. Where the plaintiff has no action for the breach of an obligation not arising from contract, the plaintiff may not recover punitive damages. In this case, Plaintiff has no claim for breach of the implied covenant of good faith and fair dealing and therefore cannot recover punitive damages. Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff's punitive damages claim is GRANTED.

**IV.**    **CONCLUSION**

For the reasons stated above, Defendant's Summary Judgment Motion is GRANTED. The clerk shall close the file.

IT IS SO ORDERED.

Dated: July 29, 2011

_____
JOSEPH C. SPERO
United States Magistrate Judge

**United States District Court**
For the Northern District of California

25